UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------
RICHARD SANFORD,

                Plaintiff,

        v.

BIODELIVERY SCIENCES
INTERNATIONAL, INC., PETER S.
GREENLEAF, JEFFREY A. BAILEY, TODD
C. DAVIS, KEVIN KOTLER, VANILA M.
SINGH, MARK A. SIRGO, and WILLIAM
MARK WATSON.

                Defendants.

Case No. 1:22-01676

**COMPLAINT FOR VIOLATIONS OF
SECTIONS 14(e) AND 20(a) OF
THE SECURITIES EXCHANGE ACT
OF 1934**

**JURY TRIAL DEMAND**

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Richard Sanford ("Plaintiff"), by his undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to himself and his own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by his attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

## NATURE OF THE ACTION

1.     This action is brought by Plaintiff against BioDelivery Sciences International, Inc. ("BDSI" or the "Company") and the members of the Company's board of directors ("Board") for violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(e) and § 78t(a). Plaintiff's claims arise in connection with the Board's recommendation that the stockholders of the Company tender their shares to Bristol Acquisition

Company Inc., ("BAC"), a wholly owned subsidiary of Collegium Pharmaceutical, Inc. ("Collegium Pharmaceutical," and together with BAC, "Collegium"), pursuant to Collegium's offer to acquire all of the issued and outstanding shares of BDSI for $5.60 per share in cash ("Tender Offer").

2.        On February 14, 2022, BDSI and Collegium announced that they had entered into an agreement ("Merger Agreement") providing for Collegium to purchase all outstanding shares of BDSI at $5.60 per share in cash ("Merger Consideration").

3.        On February 18, 2022, Collegium commenced the Tender Offer by filing a Tender Offer Statement on Schedule TO ("TO Statement") with the Securities and Exchange Commission ("SEC"). The TO Statement provides that the Tender Offer expires one after 11:59 p.m., Eastern Time, on March 18, 2022 ("Expiration Date"), unless extended or earlier terminated in accordance with the Merger Agreement. The TO Statement further provides that if the number of BDSI shares validly tendered pursuant to the Tender Offer exceeds 50% of all issued and outstanding BDSI shares, and certain other conditions are satisfied, the Tender Offer will be consummated and BAC will be merged with and into BDSI under Section 251(h) of the General Corporation Law of the State of Delaware ("DGCL") without a vote by BDSI stockholders, with BDSI continuing as the surviving corporation of Collegium Pharmaceutical ("Merger").

4.        On February 18, 2022, Defendants filed a materially false and misleading Schedule 14D-9 Solicitation/Recommendation Statement ("Recommendation Statement") with the SEC recommending that BDSI stockholders tender their shares to Collegium pursuant to the Tender Offer. Specifically, the Recommendation Statement contains material misrepresentations and omissions concerning, among other things: (i) potential conflicts of interest affecting certain BDSI officers and members of the Board, and BDSI's financial advisor, Moelis & Company LLC

("Moelis"); (ii) the valuation analyses prepared by Moelis in connection with its fairness opinion; and (iii) false opinions of BDSI management concerning projected sales of one of BDSI's products, ELYXYB, that differ radically from the opinions of such sales shared by Defendant Bailey and other BDSI executives in prior public statements. Such material misrepresentations and omissions render the Recommendation Statement false and misleading in violation of the above-referenced Exchange Act provisions.

5.      It is imperative that such violations are promptly cured to enable BDSI's public stockholders to make an informed decision concerning whether to tender their shares to Collegium before the Expiration Date.  Therefore, Plaintiff seeks to enjoin Defendants from closing the Tender Offer and/or taking any steps to consummate the Merger, until such violations are cured. Alternatively, if the Tender is closed and the Merger is consummated, Plaintiff reserves the right to recover damages suffered by himself and similarly-situated investors as a result of such violations.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(e) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.      This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he

should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

8.    Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, BDSI's common stock trades under the ticker "BDSI" on NASDAQ, which is headquartered in this District, and the false and misleading Recommendation Statement was filed with the SEC, which is headquartered in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

## PARTIES

9.    Plaintiff is, and has been at all relevant times, a continuous stockholder of BDSI stock.

10.    Defendant BDSI is a Delaware corporation with its principal executive offices located at 4131 ParkLake Avenue, Suite 225, Raleigh, NC 27612.  BDSI develops and sells medications for the treatment of chronic pain, acute migraine, and other serious and debilitating conditions. The Company's common stock trades on Nasdaq under the ticker symbol "BDSI."

11.    Defendant Peter S. Greenleaf ("Greenleaf") has served as Chairman of the Board

4

since May 2018.

12.    Defendant Jeffrey A. Bailey ("Bailey") joined the Board in March 2020, and assumed the role of Chief Executive Officer ("CEO") of BDSI in November 2020 (after serving as interim CEO from May 2020 to November 2020). Bailey signed the Recommendation Statement in his capacity as CEO of BDSI.

13.    Defendant Todd C. Davis ("Davis") has served as a member of Board since May 2018.

14.    Defendant Kevin Kotler ("Kotler") has served as a member of the Board since May 2018.

15.    Defendant Vanila M. Singh, M.D. ("Singh") has served as a member of the Board since November 2019.

16.    Defendant Mark A. Sirgo ("Sirgo") has served as a member of the Board since August 2005.

17.    Defendant William Mark Watson ("Watson") has served as a member of the Board since December 2017.

18.    Defendants identified in paragraphs 11 to 17 are collectively referred to herein as the "Individual Defendants," and together with BDSI, collectively, the "Defendants."

## OTHER RELEVANT ENTITIES

19.    Collegium Pharmaceutical is a Virginia corporation with its principal executive offices located 100 Technology Center Drive, Suite 300, Stoughton, MA 02072.    Collegium Pharmaceutical develops and sells medicines for pain management.    Collegium's common stock is traded on Nasdaq under the ticker symbol "COLL."

5

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**Company Background**</u>

20.    BDSI develops and sells medications for the treatment of chronic pain, acute migraine, and other serious and debilitating conditions.

<u>**BELBUCA**</u>

21.    BDSI's flagship product is BELBUCA® (buprenorphine), a medication that helps patients manage severe chronic pain. It is administered via BioErodible MucoAdhesive (BEMA®) technology, which uses a small polymer film applied to the inner lining of the cheek for rapid drug administration.

<u>**SYMPROIC**</u>

22.    BDSI also sells Symproic® (naldemedine), which is used to treat opioid-induced constipation (OIC) in adult patients with chronic pain.

<u>**ELYXYB**</u>

23.    On August 4, 2021, BDSI issued a press release announcing an agreement with Dr. Reddy's Laboratories Limited to acquire the U.S. and Canadian rights to ELYXYB (celecoxib oral solution), the only FDA-approved ready-to-use oral solution for the acute treatment of migraine, with or without aura, in adults.

24.    The press release quoted Defendant Bailey:

ELYXYB represents an excellent strategic fit for BDSI and a very attractive opportunity to diversify our product portfolio by expanding into the dynamic migraine market, deepening our presence in Neurology, a logical adjacency to our pain franchise.

***ELYXYB will contribute nicely to the Company's revenue growth and profitability over time***. This transaction leverages our commercial expertise and much of our existing infrastructure. We see this acquisition as establishing a great growth platform in Neurology. Further, the deal structure is attractive, allowing us to maintain our strong balance sheet and position us to pursue additional value-

enhancing business development opportunities.

25.    The press release also advised that "BDSI will be conducting an ELYXYB pediatric study which has the potential to address the significant unmet need in the pediatric patient population."

**BDSI's Financial Results in Q2 2021**

26.    On August 4, 2021, BDSI announced its result for the second quarter (Q2) of 2021. On an earnings call held on August 4, 2021 ("Q2 Earnings Call"), Defendant Bailey addressed BDSI's acquisition of the U.S. and Canadian rights to ELYXYB, which he described as the "first and what we see is a series of steps to build a growth platform in neurology." Defendant Baily added:

> ELYXYB represents an excellent strategic fit for BDSI and an attractive opportunity to diversify our product portfolio by expanding into the dynamic migraine market, deepening our presence in neurology and logical adjacency to our pain franchise. ELYXYB is the only ready-to-use oral solution approved by the FDA for the treatment of acute migraine with or without aura in adults. ***It has intellectual property protection into 2036. For the planned first quarter 2022 launch, ELYXYB will participate in a substantial growing and evolving migraine market. It is anticipated to drive the company's revenue growth and shareholder value while leveraging much of our existing infrastructure***. (emphasis added).

27.    Defendant Bailey estimated that the acquisition of the rights to ELYXYB would be accretive within approximately "24 months from commercial launch, which is anticipated to be in the first quarter of 2022."

**BDSI's Financial Results in Q3 2021**

28.    On November 3, 2021, BDSI announced its result for the third quarter (Q3) of 2021. On an earnings call held on November 3, 2021 ("Q3 Earnings Call"), Defendant Bailey shared his opinion concerning the sales prospects for ELYXYB:

> ELYXYB provides product diversity and is a third growth driver ***with an estimated peak year revenue at a range of $350 million to $400 million***. We are incredibly

excited for the future of BDSI. We are poised for the growth with an established paying franchise in our anticipating strong momentum with the addition of ELYXYB to our neurology franchise, a logical adjacency to our current product portfolio in pain. The ELYXYB acquisition, diversifies our portfolio beyond pain by establishing a dedicated neurology salesforce and allowing us to leverage our current infrastructure to manage the addition of ELYXYB in a very efficient way. It's also important to note that we have a strong team that has significant launch experience, including experience in neurology and migraine. We've been energized by the positive feedback from clinicians and the opportunity to get further integrated into the neurology community. We held a successful key opinion leader Advisory Board Meeting in Chicago last month and heard their thoughts about the clinical profile ELYXYB is placed in the market and the potential prescriber ELYXYB as the only ready-to-use oral solution for migraine approved by the FDA. This has only increased our enthusiasm about ELYXYB that we'll be launching in the first quarter of 2022. I also wanted to mention to you that we were pleased that ELYXYB was nominated to the prestigious Pri Galien award which recognizes innovation to improve human condition in the best pharmaceutical product category.

29.    BDSI Executive Vice President and CFO, Terry Coelho ("Coelho") reiterated Defendant Bailey's opinion concerning the sales expectations for ELYXYB:

Now, let's turn to some of our expectations for ELYXYB. Our projected long-term outlook for ELYXYB net sales is ***in the range of $350 million to $400 million***, including preliminary estimates for the potential pediatric label expansion.

30.    Later on the Q3 Earnings Call, an analyst asked how investors should be thinking about the ELYXYB ramp. Defendant Bailey responded that "***we gave our view of the long-term picture as far as peak year sales into the 2030s, as far as, peak of year sales of $350 million to $400 million***." (emphasis added). Defendant Bailey then explained that BDSI would execute the ELYXYB launch by following the playbook that's "worked well for us with BELBUCA," and concluded that "we're really feeling good about where we get as time goes on with ELYXYB."

**BDSI's Financial Results in 4Q 2021**

31.    On January 20, 2022, BDSI issued a press release ("Jan 2022 Release") concerning its anticipated results for full year 2021.

32.    The press release quoted Defendant Bailey:

8

We also continue the commercial planning for ELYXYB™, an FDA-approved drug *with substantial peak revenue potential*, which represents our broader entry into the neurology market. ***Looking ahead, we are excited about launching ELYXYB later this quarter***, continuing to grow our current core brands, BELBUCA and Symproic®, ***and potentially benefiting from a growth tailwind as COVID recedes***.

33.    Concerning ELYXYB, BDSI President and Chief Commercial Officer, Scott Plesha ("Plesha"), reaffirmed *for the fourth time* "***projected peak sales outlook of $350-$400 million***, including potential pediatric label expansion." (emphasis added). He added "[w]e are pleased with the positive reception by headache specialists and payors from our discussions on ELYXYB, ***which is the first and only liquid, ready-to-use product in the migraine market***."

**Negotiation of the Merger Agreement With Collegium**

34.    The Recommendation Statement describes the background leading up to the Tender Offer and proposed Merger. The relevant events are set forth below.

35.    On December 22, 2021, two days after a favorable ruling for BDSI in a patent litigation, Joseph Ciaffoni, President and Chief Executive Officer of Collegium ("Ciafonni"), contacted Defendant Bailey to discuss a potential strategic transaction between BDSI and Collegium. Thereafter, over the course of the next week, BDSI and Collegium had preliminary conversations regarding a potential strategic transaction. Previously, in July 2019, BDSI had submitted an offer to acquire Collegium in an all-stock deal, but discussions terminated.

36.    Subsequently, throughout the first and second weeks of January 2022, Moelis and Collegium's financial advisor, Jefferies LLC ("Jefferies"), discussed a potential combination. During this time, BDSI also had a call with Party C, which had previously held discussions with BDSI about a potential strategic transaction in June 2021.

37.    On January 6, 2022, during a call with Defendant Bailey, Ciaffoni stated, without specifying any terms, that Collegium would soon present an offer to acquire BDSI.

38.     On January 7, 2022, BDSI had a call with Party A, which had previously held discussions with BDSI about a potential strategic transaction in July 2020. That same day, Defendant Baily had a call with Party C during which it was agreed that members of their respective management teams would meet later in January.

39.     On January 12, 2022, Collegium submitted a proposal to acquire all of the outstanding shares of the Company's Common Stock at a price of $4.60 per share in cash (the "Initial Proposal"). Later that day, the Board held a meeting at which, among other things, it "formed a Transaction Committee of *independent* directors to manage day-to-day matters related to the potential strategic transaction in order to provide an efficient manner in which to actively supervise the process and to have the ability to meet as often as needed, and also *authorized the Transaction Committee to supervise and direct any outreach to additional parties*." (emphasis added). The Transaction Committee consisted of Defendants Kotler, Davis and Sirgo.

40.     On January 12, 2022, Defendant Bailey spoke with Party A.

41.     On January 17, 2022, BDSI had a call with Party B, which had previously held discussions with BDSI about a potential strategic transaction in December 2020.

42.     On January 25, 2022, the Board met to discuss management's preliminary long-range plan, including the underlying assumptions and related risks, and the preparation of forecasts based on such long-range plan. Additionally, at that meeting, the Board directed Moelis to inform Jefferies of their rejection of the Initial Proposal, and to express a willingness to provide additional limited due diligence information to allow Collegium to increase its offer. After Moelis advised Jefferies of the Board's rejection of the Initial Proposal, Collegium received access to a data room providing, *inter alia*, details concerning BDSI's long-term forecasts and information on ELYXYB.

43.     On January 28 and 29, 2022, BDSI and Collegium had calls to discuss BDSI's long-

term forecasts and strategic plan, 2022 budget and operating expense detail, and clinical and commercial matters relating to the upcoming launch of ELYXYB.

44.     On January 31, 2021, Jeffries submitted an updated bid from Collegium to acquire all of BDSI's outstanding shares for $5.00 per share in cash (the "January 31 Proposal"). That same day, BDSI had a call with Party C.

45.     On February 1, 2022, the Transaction Committee held a meeting with Moelis and BDSI's law firm, Goodwin Procter ("Goodwin") to discuss the January 31 Proposal. The Transaction Committee asked Moelis to determine if Collegium would be willing to increase its offer to at least $5.60 per share.

46.     On February 2, 2022, Party A emailed Moelis to introduce their financial advisor, and to discuss a potential transaction. Later that day, at the direction of the Transaction Committee, Moelis spoke to Party A's financial advisor about Party A's interest in a potential transaction.

47.     On February 2, 2022, Jefferies submitted a revised proposal to Moelis on behalf of Collegium to acquire the Company for $5.30 per share in an all-cash transaction (the "February 2 Proposal"). Also on February 2, 2022, (i) Party A had a call with Moelis during which it was confirmed that Party A would be making a proposal to acquire BDSI, and (ii) Party C had a call with Moelis during which they indicated that their chief executive officer and board of directors supported a potential strategic transaction with BDSI, and would welcome a longer-term discussion on the merits of a transaction; Party C, however, did not express a view on price.

48.     On February 3, 2022, Moelis, at the direction of the Transaction Committee, rejected the February 2 Proposal submitted by Collegium.

49.     On February 3, 2022, Party B had a call with Moelis during which they indicated they would not be pursuing a transaction, but would consider re-evaluating in the next one to two

months.

50.    Meanwhile, over the course of February 3 and 4, 2022, Ciaffoni and Defendant Bailey continued to negotiate a transaction between BDSI and Collegium, along with representatives of Moelis and Jefferies.

51.    On February 4, 2022, Party C confirmed to Moelis that they would be interested in pursuing an all-stock merger of equals type transaction. Also on February 4, 2022, Defendant Bailey received a proposal from Party A of $5.25 per share, comprised of $2.05 per share in cash and $3.20 per share in Party A common stock, subject to due diligence. Party A's proposal also stated that Party A had formally engaged financial and legal advisors. Later that day, Moelis shared BDSI's financial forecasts with Party A.

52.    Later on February 4, 2022, at the direction of the Board, Moelis advised Jeffries that there was competing interest from other parties and that BDSI would only be willing to enter into exclusive negotiations with Collegium upon the receipt of an offer of at least $5.60 per share. In response, Collegium sent BDSI a revised offer for $5.60 per share in cash (the "February 4 Proposal"). Following the receipt of the February 4 Proposal, the Board held a meeting during which the members of the Board discussed the terms of the February 4 Proposal and authorized BDSI to enter into exclusive negotiations with Collegium. Subsequently, from February 7-9, 2022, the parties' lawyers negotiated the Merger Agreement.

53.    On February 10, 2022, the Board held a meeting to discuss the progress of negotiations with Collegium. At the meeting, the Board discussed "amended terms of the engagement of Moelis as the Company's financial advisor," including "Moelis' customary relationship disclosures for Collegium and the Company." The Board "determined that such relationships would not interfere with Moelis' ability to provide financial advisory services to the

Company."

**The Financial Forecasts of BDSI Management and Fairness Opinion of Moelis**

54.     On February 13, 2022, after several days of negotiations, the Board held a meeting at which, *inter alia*, Moelis rendered an oral opinion (subsequently confirmed in a written opinion dated February 13, 2022) ("Moelis Fairness Opinion") that the Merger Consideration was fair, from a financial point of view, to BDSI shareholders.

55.     The Moelis Fairness Opinion was based in part on financial forecasts provided to Moelis by BDSI management. First, BDSI management provided Moelis with (i) Base Case Forecasts of revenue, gross profit, and EBIT for BDSI's products (*other than ELYXYB*) for fiscal years 2022 through 2028, based on various factors such as pricing, market share, and competition, and (ii) Upside Strategic Plan Forecasts that adjusted the Base Case Forecasts by assuming the high end of management's assessment of possible outcomes for BELBUCA's revenue growth, market share, market penetration, and pricing over the relevant time period.

56.     Second, since both the Base Case Forecasts and the Upside Strategic Plan Forecasts excluded projections for ELYXYB, projected sales of ELYXYB were the subject of a separate risk-adjusted forecast for the period 2022-2037 prepared by BDSI management ("ELYXYB Forecasts", and collectively with the Base Forecasts and Upside Strategic Plan Forecasts, the "Financial Forecasts").

57.     Moelis separately calculated Unlevered Cash Flows for each of the above forecasts for use in a discounted cash flow (DCF) analysis ("DCF Analysis") (as further described below).

58.     The following table displays the Base Case Forecasts prepared by BDSI management that appear in the Recommendation Statement:

| ($ in millions) | 2022E[1] | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---|---|---|---|---|---|---|
| Total Revenue | $137 | $204 | $229 | $266 | $316 | $144 | $85 |
| Gross Profit | $119 | $176 | $198 | $232 | $279 | $126 | $74 |
| EBIT | $ 28 | $ 51 | $ 77 | $122 | $211 | $ 81 | $29 |
| Unlevered Free Cash Flow[2] | $ 25 | $ 43 | $ 62 | $ 94 | $160 | $ 84 | $31 |

59.    The following table displays the Upside Strategic Plan Forecasts prepared by BDSI management that appear in the Recommendation Statement:

| ($ in millions) | 2022E[1] | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---|---|---|---|---|---|---|
| Total Revenue | $144 | $214 | $241 | $280 | $333 | $149 | $88 |
| Gross Profit | $125 | $185 | $208 | $242 | $288 | $128 | $74 |
| EBIT | $ 34 | $ 61 | $ 87 | $131 | $220 | $ 83 | $29 |
| Unlevered Free Cash Flow[2] | $ 28 | $ 49 | $ 69 | $100 | $165 | $ 86 | $31 |

60.    The following table displays the ELYXYB Forecasts prepared by BDSI management that appear in the Recommendation Statement:

| ($ in millions) | 2022E[1] | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E | 2037E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenue | $ 5 | $ 23 | $40 | $57 | $71 | $88 | $107 | $127 | $147 | $157 | $167 | $179 | $190 | $203 | $77 | $36 |
| Gross Profit | $ 4 | $ 20 | $34 | $45 | $61 | $75 | $ 83 | $107 | $124 | $132 | $140 | $149 | $159 | $169 | $66 | $30 |
| EBIT | $(25) | $ (9) | $ (1) | $ 1 | $ 2 | $ 8 | $ 9 | $ 18 | $ 29 | $ 32 | $ 21 | $ 23 | $ 26 | $ 49 | $47 | $25 |
| Unlevered Free Cash Flow[2] | $(27) | $(11) | $ (3) | $ (0) | $ 0 | $ 5 | $ 6 | $ 12 | $ 20 | $ 23 | $ 15 | $ 17 | $ 19 | $ 36 | $51 | $24 |

61.    The Moelis Fairness Opinion used the Unlevered Free Cash Flow numbers in the above forecasts to perform the DCF Analysis, which the Recommendation Statement described as follows:

> Moelis performed a discounted cash flow analysis of the Company using the Financial Forecasts to calculate (i) the present value of the estimated future unlevered after-tax free cash flows projected to be generated by the Company, (ii) the present value of the Company's estimated terminal value, (iii) ***the present value of ELYXYB***, and (iv) the present value of the Company's net operating losses ("NOLs").

62.    Concerning the valuation of ELYXYB, the Recommendation Statement explains that Moelis performed a separate valuation of ELYXYB using the ELYXYB Forecasts.

63.    Combining all of the valuations performed by Moelis, the DCF Analysis purported

14

to yield value ranges for BDSI common stock of $4.65 to $5.95 per share using the Base Case Forecasts, and $4.85 to $6.20 per share using the Upside Strategic Plan Forecasts.

**The Board Approves the Merger and Resolves to Recommend the Tender Offer**

64.    Following the oral presentation of the Moelis Fairness Opinion, and for the reasons set forth in the Recommendation Statement (including consideration of the Moelis Fairness Opinion), the Board unanimously (1) approved the Merger Agreement and the transactions contemplated thereby ("Proposed Transactions"), including the Tender Offer and the Merger, (2) determined that the Proposed Transactions, including the Tender Offer and the Merger, are in the best interests of BDSI and its stockholders, (3) resolved that the Merger shall be governed by and effected under Section 251(h) of the DGCL, and (4) resolved to recommend that BDSI stockholders tender their shares to Collegium pursuant to the Tender Offer.

65.    On February 14, 2022, the Merger Agreement was executed, and before the opening of trading on the U.S. stock markets, BDSI and Collegium each issued a press release announcing the execution of the Merger Agreement and the forthcoming commencement of the Tender Offer.

**Receipt of Different Consideration by Officers and Directors**

66.    The Recommendation Statement (at 4-5) acknowledges that the executive officers and directors of BDSI may be considered to have interests in the Proposed Transactions (including the Tender Offer and the Merger) "that are different from, or in addition to, those of other stockholders generally." Thereafter, the Recommendation Statement provides that "[t]he following is a discussion of ***all known*** material agreements, understandings and ***any actual or potential conflicts of interest*** between the Company and its executive officers or directors that relate to the Transactions." (emphasis added).

67.    Among other conflicts, Section 3.8 of the Merger Agreement provides that each BDSI Option and Restricted Stock Unit ("RSU"), whether vested or unvested, that is outstanding immediately prior to the closing of the Merger, shall automatically accelerate and become fully vested and exercisable upon consummation of the Merger, and thereby entitle their holders to receive cash payments upon such consummation, as per formulas described in the Recommendation Statement.

68.    As a result of such automatic acceleration and vesting of all outstanding Options and RSU's upon consummation of the Merger, BDSI's top five officers stand to earn millions in total equity award compensation upon consummation of the Merger—a major liquidity event— as per the following tables appearing in the Recommendation Statement:

| | Vested Company Stock Options | | | Unvested Company Stock Options | | | Company Restricted Stock Units | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares of Common Stock Underlying Vested Company Stock Options (#) | Weighted Average Exercise Price ($) | Aggregate Vested Company Stock Option Payment ($)[1] | Shares of Common Stock Underlying Unvested Company Stock Options (#) | Weighted Average Exercise Price ($) | Aggregate Unvested Company Stock Option Payment ($)[1] | Company Restricted Stock Units (#) | Aggregate Company Restricted Stock Units Payment ($)[2] | Total Equity Award Consideration ($) |
| **Executives** | | | | | | | | | |
| Jeffrey A. Bailey | 538,805 | 3.98 | 875,478.20 | 1,767,467 | 3.70 | 3,365,205.98 | 316,919 | 1,774,746.40 | 6,015,430.58 |
| Scott Plesha | 361,074 | 3.88 | 620,790.24 | 601,869 | 3.73 | 1,125,839.22 | 119,228 | 667,676.80 | 2,414,306.26 |

| | Vested Company Stock Options | | | Unvested Company Stock Options | | | Company Restricted Stock Units | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares of Common Stock Underlying Vested Company Stock Options (#) | Weighted Average Exercise Price ($) | Aggregate Vested Company Stock Option Payment ($)[1] | Shares of Common Stock Underlying Unvested Company Stock Options (#) | Weighted Average Exercise Price ($) | Aggregate Unvested Company Stock Option Payment ($)[1] | Company Restricted Stock Units (#) | Aggregate Company Restricted Stock Units Payment ($)[2] | Total Equity Award Consideration ($) |
| John Golubieski | — | — | — | 706,666 | 3.84 | 1,241,010.17 | 126,199 | 706,714.40 | 1,947,724.57 |
| Thomas Smith, M.D | 343,422 | 3.55 | 703,721.53 | 450,649 | 3.74 | 839,795.72 | 88,719 | 496,826.40 | 2,040,343.65 |
| James Vollins | 204,162 | 3.63 | 401,474.70 | 502,805 | 3.67 | 969,122.44 | 91,401 | 511,845.60 | 1,882,442.74 |
| **Directors** | | | | | | | | | |
| Peter S. Greenleaf | 111,337 | 3.30 | 255,533.50 | 67,174 | 3.55 | 137,617.56 | 27,746 | 155,377.60 | 548,528.66 |
| Todd C. Davis | 83,503 | 3.30 | 191,650.61 | 50,380 | 3.55 | 103,212.20 | 22,685 | 127,036.00 | 421,898.81 |
| Kevin Kotler | 42,880 | 3.66 | 83,187.20 | 50,380 | 3.55 | 103,212.20 | 22,685 | 127,036.00 | 313,435.40 |
| Vanila M. Singh | 147,888 | 4.06 | 227,797.12 | 66,880 | 3.70 | 127,347.20 | 17,019 | 95,306.40 | 450,450.72 |
| Mark A. Sirgo | 137,380 | 4.13 | 201,267.20 | 66,880 | 3.70 | 127,347.20 | 11,685 | 65,436.00 | 394,050.40 |
| William Mark Watson | 90,120 | 3.28 | 209,318.00 | 50,380 | 3.55 | 103,212.20 | 22,685 | 127,036.00 | 439,566.20 |

69.    Absent the Merger Agreement providing for automatic acceleration and vesting of all outstanding Options and RSU's upon consummation of the Merger, the Options and RSU's of BDSI's top five officers would only accelerate and fully vest in the event of a "Qualifying Termination" within a 6- to 12-month period following a "change in control." However, there is no indication that any of BDSI's top five officers will be terminated after the Merger closes, and thus absent the automatic acceleration and vesting of all Options and RSU's upon consummation of the Merger, there would be no major liquidity event for such officers.

70.    Additionally, because the acquisition of BDSI contemplated by the Merger Agreement is an all-cash deal (rather than stock-for-stock deal as proposed by the Party C bidder, or a combination of stock and cask as proposed by the Party A bidder), BDSI's directors and senior officers will earn additional millions on their current stockholdings upon consummation of the Merger (beyond the earnings resulting from immediate acceleration and vesting of Options and RSU's), as per the following tables appearing in the Recommendation Statement:

| | Number of Shares (#) | Cash Value of Shares ($) |
|---|---|---|
| **Executive Officers:** | | |
| Jeffrey A. Bailey | 99,800 | 558,880.00 |
| Scott Plesha | 345,127 | 1,932,711.20 |
| John Golubieski | — | — |
| Thomas Smith, M.D. | 52,530 | 294,168.00 |
| James Vollins | — | — |
| **Directors:** | | |
| Peter S. Greenleaf | 105,034 | 588,190.40 |
| Todd C. Davis | 252,207 | 1,412,359.20 |
| Kevin Kotler | 7,588,395[1] | 42,495,012.00 |
| Vanila M. Singh, M.D., MAMC | 35,851 | 200,766.60 |

| | Number of Shares (#) | Cash Value of Shares ($) |
|---|---|---|
| Mark A. Sirgo, PharmD | 1,166,866 | 6,534,450.60 |
| William Mark Watson | 90,663 | 507,713.80 |
| **All directors and executive officers as a group** | 9,736,473 | 54,524,249.80 |

71.     In particular, the purportedly independent members of the Transaction Committee—Defendants Kotler, Sirgo and Davis— will collectively immediately receive over $50 million in cash (Kotler ($42,495,012), Sirgo ($6,534,450) and Davis ($1,412,359)).

**The Recommendation Statement Contains Material Misrepresentations and Omissions**

72.     Defendants disseminated a false and misleading Recommendation Statement to BDSI's stockholders that misrepresents or omits material information that is necessary for BDSI stockholders to make an informed decision concerning whether to tender their shares to Collegium pursuant to the Tender Offer.

***Material Omissions Concerning Nature, Timing and Content of, and Participants in any Discussions Regarding Post-Merger Employment***

73.     In Item 3, in the Section entitled "Executive Officer and Director Arrangements Following the Merger, the Recommendation Statement states that "[w]hile, as of the date of the [Recommendation Statement], none of the Company's current directors or executive officers have entered into any agreements or definitive arrangements with Collegium, the Company, or their respective affiliates regarding continued service with Collegium, the Company or their respective affiliates after the Effective Time, it is possible that Collegium, the Company, or their respective affiliates may enter into employment or other arrangements with the Company's management prior to or following closing of the Transactions." (Recommendation Statement at 10). This statement omits material facts that are necessary to make the statement not misleading.

74.     While the statement above advises that none of BDSI's officers or directors have yet entered into any agreements for post-Merger employment, it is reasonable to infer that the

BDSI officers and directors who negotiated the Proposed Transactions may have had substantive discussions with Collegium about post-Merger employment before the Board approved the deal with Collegium.

75.    The existence of discussions between BDSI's directors and officers with Collegium concerning post-Merger employment before the Proposed Transactions were approved would have created a material conflict since the prospect of post-Merger employment is a material interest that might have incentivized certain BDSI directors and officers to favor Collegium over other bidders during the sales process in order to secure post-Merger employment—to the detriment of other BDSI stockholders who did not share this interest.[1]

76.    Therefore, since the Recommendation Statement purports to disclose all known "actual or potential conflicts of interest" concerning BDSI's officers and directors, BDSI stockholders are entitled to further disclosures concerning the nature, content and timing of any discussions between BDSI officers and directors and Collegium concerning post-Merger employment, in order to help BDSI stockholders make an informed decision concerning whether to tender their shares.

***Material Omissions Concerning Potential Conflicts of Interest of Moelis***

77.    In Item 4, in the Section entitled "Background of the Transactions," the Recommendation Statement states that, at a meeting held on February 10, 2022, the Board reviewed "Moelis' ***customary relationship disclosures*** for Collegium and the Company," and "***determined that such relationships would not interfere with Moelis' ability to provide financial***

---

[1] As an example of potential favoritism towards Collegium, the Recommendation Statement indicates that Collegium was the only bidder given access to a data room to facilitate due diligence.

***advisory services to the Company***." (emphasis added). (Recommendation Statement at 16). This statement omits material facts that are necessary to make the statement not misleading.

78.     The statement above indicates that, upon certain disclosures by Moelis, the Board identified potential conflicts of interest that might compromise Moelis's ability to serve as an unbiased financial advisor to BDSI in connection with the Proposed Transactions. Because, as noted above, Moelis played a highly active role in negotiating the Proposed Transactions, and the Board's decision to approve the Merger and recommend that BDSI stockholders tender their shares was based in part on the Moelis Fairness Opinion, any conflicts Moelis had that might have prevented it from (i) conducting negotiations in an unbiased manner, and (ii) providing unbiased advice to BDSI concerning the fairness of the Merger Consideration, would be material to the decision of BDSI stockholders to tender their shares.

79.     Yet, despite the materiality of any such potential conflicts, the Recommendation Statement provides *zero* detail concerning (i) the nature of the conflicts that the Board identified (including whether any arose out of prior relationships between Moelis and Colleguim that might have predisposed Moelis to favor Collegium over bidders A, B, and C), and (ii) how and why the Board determined that "such relationships would not interfere with Moelis' ability to provide financial advisory services to the Company." To help them determine whether to tender their shares, BDSI stockholders are entitled to further disclosures concerning the nature of such conflicts to enable them to evaluate for themselves whether Moelis's potential conflicts of interest were material enough to taint the reliability of the Moelis Financial Opinion, and provide Moelis with an incentive to manipulate its financial analyses.

80.     Having disclosed that the Board evaluated potential conflicts of Moelis, Defendants were obliged to provide BDSI stockholders with a full and accurate description of the nature of

such potential conflicts, and how and why it was determined that such conflicts were not a concern, in order to avoid misleading BDSI stockholders regarding the purported impartiality of Moelis, and help BDSI stockholders make an informed decision concerning whether to tender their shares.

***Material Omissions Regarding Any Concerns About Director "Independence" That Prompted Formation of the Transaction Committee***

81.    In Item 4, in the Section entitled "Background of the Transactions," the Recommendation Statement states that a meeting held on January 12, 2022, BDSI's counsel, Goodwin, reviewed with the members of the Board their fiduciary duties in the context of the Initial Proposal. Thereafter, *at the same meeting*, the Board "formed a Transaction Committee of ***independent directors*** to manage day-to-day matters related to the potential strategic transaction in order to provide an efficient manner in which to ***actively supervise the process*** and to have the ability to meet as often as needed, and also authorized the Transaction Committee to ***supervise and direct*** any outreach to additional parties." (emphasis added). (Recommendation Statement at 13). This statement omits material facts that are necessary to make the statement not misleading.

82.    The statement above suggests that Goodwin's presentation on fiduciary duties may have raised concerns about the "independence" of certain Board members with respect to negotiation of a transaction, and these concerns at least in part motivated the Board to form a Transaction Committee consisting of three purportedly "independent" directors out of the full seven-member Board, to supervise and manage the negotiations with Collegium and Parties A, B, and C. The Recommendation Statement, however, provides *zero* details regarding what concerns, if any, about the "independence" of the four Board members not appointed to the Transaction Committee prompted the formation of the Transaction Committee (including whether any such concerns arose out of prior relationships between such directors and Colleguim that might have predisposed them to favor Collegium over bidders A, B, and C).

83.     The independence of fiduciaries negotiating the sale of a public company on behalf of its public shareholders is a material consideration for such shareholders. Here, after a flurry of activity on February 1-3, 2022, the Transaction Committee disappears from the narrative appearing in the Recommendation Statement, and Defendant Bailey and the *full* Board manage, direct and supervise the remainder of the negotiations with Collegium and Parties A, B, and C, through approval of the deal with Collegium. In particular, it is the *full* Board (not the Transaction Committee) that, on February 4, 2022, directed Moelis to offer Collegium the opportunity to enter into exclusive negotiations, and terminated negotiations with Party A after Party A had just made a proposal substantially equal in value (i.e., $5.25 per share) to Collegium's February 2 Proposal of $5.30 per share.

84.     Since the Recommendation Statement purports to disclose all known "actual or potential conflicts of interest" of BDSI's officers and directors, and because the independence of the Board is a material consideration for BDSI stockholders, BDSI stockholders are entitled to further disclosures regarding the nature of any concerns about "independence" that motivated the creation of the Transaction Committee, and why the Transaction Committee effectively ceased operating after February 3, 2022, in order to help BDSI stockholders make an informed decision concerning whether to tender their shares.

### ***Material Omissions Regarding a "Best and Final Offer" by Another Bidder***

85.     The Recommendation Statement states that "another party contacted by the Company had expressed interest in potentially acquiring the Company and provided a best and final offer as part of the process…" (Recommendation Statement at 18).

86.     The contents of the "best and final offer" is obviously material to BDSI stockholders so they can compare such offer to the Collegium offer that the Board ultimately

approved. The Recommendation Statement, however, provides zero detail concerning this "best and final offer," including the content of the offer, and whether it arose out of the stock-and-cash offer submitted by Party A. BDSI stockholders are entitled to further disclosures concerning this "best and final offer" in order to help them make an informed decision concerning whether to tender their shares.

***The ELYXYB Forecasts in the Recommendation Statement Were Subjectively and
Objectively False Statements of Opinion***

87.     As noted above, on the Q3 Earnings Call, Coelho and Defendant Bailey both presented the opinion of BDSI management that peak annual revenue for ELYXYB would reach $350 million to $400 million. This opinion was *repeated three times* on the Q3 Earnings Call.

88.     As further noted above, on January 20, 2022—less than four weeks before the Recommendation Statement was filed—BDSI issued a press release in which Plesha reaffirmed for the *fourth time* a projected peak sales outlook of $350-$400 million for ELYXYB. That press release also quoted Defendant Bailey:

> ***Looking ahead, we are excited about launching ELYXYB later this quarter***, continuing to grow our current core brands, BELBUCA and Symproic®, ***and potentially benefiting from a growth tailwind as COVID recedes***.

89.     In contrast to the opinion of ELYXYB's peak revenue potential of $350-$400 million presented *four times* in Defendant Bailey's and BDSI's prior public statements, the ELYXYB Forecasts appearing in Item 4 in the Recommendation Statement reflect a vastly more pessimistic opinion concerning peak sales of ELYXYB, which are projected at $203 million by 2035. (Recommendation Statement at 29). The $350 million to $400 million peak ELYXYB sale range presented in Defendants Bailey's and BDSI's prior public statements about ELYXYB, are approximately ***75% to 100% higher*** than the $203 million peak sale projection appearing in the

ELYXYB Forecasts in the Recommendation Statement. This is a *huge* discrepancy that is impossible to ignore, and wrecks the credibility of all of the sales projections in the ELYXYB Forecasts for all of the years referenced (since the assumptions underlying the projection of peak sales of $203 million in 2035 would necessarily have also underlay the projection of ELYXYB sales in prior years).

90.     The Recommendation Statement states that the ELYXYB Forecasts "were based on certain internal ***assumptions*** about the commercial success, pricing, market share, market penetration, competition, the commercial life of ELYXYB, and other relevant factors, ***including the impact of COVID-19***." (emphasis added). The Recommendation Statement further states that BDSI made no representations to Collegium concerning the Financial Forecasts (of which the ELYXYB Forecasts were a part), and that such forecasts "were provided to Moelis ***solely*** for use in developing its fairness opinion." (emphasis added). As noted above, the ELYXYB Forecasts was one of the components included by Moelis to calculate a per share value range under the DCF Analysis.

91.     Given the *huge* discrepancy between the prior public statements of Defendant Bailey and BDSI concerning peak sales of ELYXYB, and the peak sales of ELYXYB set forth in the ELYXYB Forecasts, the ELYXYB Forecasts in the Recommendation Statement plainly did not reflect the legitimately held opinion of BDSI management regarding ELYXYB's future sales prospects. Instead, it is apparent that the ELYXYB projections shared in Defendants Bailey's and BDSI's prior public statements represented the legitimately held opinion of BDSI management concerning the future sales prospects for ELYXYB, and the ELYXYB Forecasts were created *solely* for the improper purpose of engineering a DCF Analysis that would allow Moelis to conclude that the Merger Consideration was fair. In sum, because BDSI management did not

genuinely and honestly believe the ELYXYB Forecasts in the Recommendation Statement, such forecasts are subjectively false.

92.     The ELYXYB Forecasts are also objectively false because they plainly relied on unreasonable and inaccurate assumptions, as evidenced by the *huge* gap between management's opinion concerning projected peak sales of ELYXYB appearing *at least four times* in prior public statements, and the opinion concerning projected peak sales of ELYXYB expressed in the ELYXYB Forecasts. There can be no plausible explanation for that vast gap other than that, in connection with preparing the ELYXYB Forecasts in the Recommendation Statement, BDSI management manipulated the assumptions underlying their prior public statements concerning peak sales of ELYXYB in order to generate the substantially more pessimistic ELYXYB Forecasts for the sole purpose of ensuring a DCF Analysis that would allow Moelis to conclude the Merger Consideration was fair.

93.     As an example, the Recommendation Statement states that the ELYXYB Forecasts considered "the impact of COVID-19," which suggests COVID-19 might impede ELYXYB sales. But in the January 20, 2022 press release, when addressing the launch of ELYXYB, Defendant Bailey spoke of "***benefiting*** from a ***growth tailwind*** as COVID recedes." (emphasis added). This prior statement directly contradicts the assumption in the Recommendation Statement that COVID-19 was a "headwind" that would impede ELYXYB sales, and thus BDSI management clearly did not believe that assumption when they created the ELYXYB Forecasts.

94.     Defendants harbored an incentive to create the false ELYXYB Forecasts and thereby make the Merger Consideration appear fair because they stand to reap millions from their BDSI shares, and acceleration of BDSI Options and RSU's, if the all-cash transaction with Collegium is consummated. That incentive motivated BDSI management to provide Moelis with

the false ELYXYB Forecasts, which depressed the value share ranges derived from the DCF Analysis, and thereby made the Merger Consideration appear fair, when in fact, it is not.

### *The Moelis Financial Opinion Was False and Misleading*

95.     Since one of the components of the DCF Analysis underlying the Moelis Fairness Opinion was the ELYXYB Forecasts, and the ELYXYB Forecasts are subjectively and objectively false, the Moelis Fairness Opinion was also false and misleading to the extent it used the false and misleading ELYXYB Forecasts as one of the components to calculate value per share ranges under the DCF Analysis. Had the DCF Analysis used reasonable ELYXYB projections that BDSI management genuinely believed, the value per share ranges derived from the DCF Analysis would have been higher and indicated that the Merger Consideration was not fair.

96.     Indeed, at the time when the Merger and Tender Offer was announced, according to an analysis of Wall Street BDSI price targets in the last 90 days published on Seeking Alpha, the 7 analysts covering BDSI have an average price target of $6.49 per share, with a high price target of $10 per share. Both are above the price per share offered by Collegium and approved by the Board:



97.     Beyond its reliance on the false and misleading ELYXYB Forecasts, the description of the Moelis Fairness Opinion in the Recommendation Statement also improperly fails to disclose certain key inputs and assumptions underlying the analyses on which it was based, which further renders it false and misleading.  Without this information, as described below, BDSI's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on the Moelis Fairness Opinion in determining whether to tender their shares. This omitted information, if disclosed, would significantly alter the total mix of information available to BDSI's stockholders.

98.     With respect to Moelis's *Discounted Cash Flow Analysis* of BDSI, the Recommendation Statement fails to adequately disclose how Moelis determined that a discount rate range of 7.00% to 11.25% was appropriate. The explanation that the discount rate range is "based on an estimated range of the Company's weighted average cost of capital ("WACC"), " and

"[t]he estimated WACC range was derived using the Capital Asset Pricing Model and a size premium," is unintelligible.

99.    Notably, a DCF analysis by online research firm Simply Wall Street uses a discount rate of 5.3% to value BDSI (according to a fully disclosed methodology):

## Share Price vs. Fair Value

Below are the data sources, inputs and calculation used to determine the intrinsic value for BioDelivery Sciences International.

| Data Point | Source | Value |
| --- | --- | --- |
| Valuation Model | | 2 Stage Free Cash Flow to Equity |
| Levered Free Cash Flow | Average of 7 Analyst Estimates (S&P Global) | See below |
| Discount Rate (Cost of Equity) | See below | 5.3% |
| Perpetual Growth Rate | 5-Year Average of US Long-Term Govt Bond Rate | 1.9% |

| Data Point | Calculation/ Source | Result |
|---|---|---|
| Risk-Free Rate | 5-Year Average of US Long-Term Govt Bond Rate | 1.9% |
| Equity Risk Premium | S&P Global | 4.2% |
| Pharmaceuticals Unlevered Beta | Simply Wall St/ S&P Global | 0.60 |
| Re-levered Beta | = 0.33 + [(0.66 * Unlevered beta) * (1 + (1 - tax rate) (Debt/Market Equity))] <br> = 0.33 + [(0.66 * 0.600) * (1 + (1 - 21.0%) (10.38%))] | 0.765 |
| Levered Beta | Levered Beta limited to 0.8 to 2.0 (practical range for a stable firm) | 0.8 |
| Discount Rate/ Cost of Equity | = Cost of Equity = Risk Free Rate + (Levered Beta * Equity Risk Premium) <br> = 1.92% + (0.800 * 4.24%) | 5.31% |

100.     The much higher discount rate of 7.00% to 11.25% used by Moelis (according to an undisclosed methodology) obviously depressed the value range for BDSI's shares. *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range). Shareholders are entitled to further disclosure on how Moelis derived its seemingly excessively high discount rate range. *See Topps*, 926 A.2d at 76 (subjective judgments regarding discount rates are not scientific, "but highly-paid valuation advisors should be able to rationally explain them.").

101.     With respect to Moelis's *Unlevered Free Cash Flow* projections appearing in the Base Forecasts, Upside Strategic Plan Forecasts, and ELYXYB Forecasts, the Recommendation Statement fails to adequately disclose how Moelis derived those unlevered free cash flow projections other than to state in a footnote that "[u]nlevered free cash flow is calculated as net operating profit after tax, less capital expenditures, less changes in net working capital and plus

depreciation and amortization." But none of those metrics—net operating profit after tax, capital expenditures, net working capital, depreciation and amortization—appear anywhere else in the Recommendation Statement and thus their significance is unclear. Since Moelis used the unlevered free cash flows in its DCF Analysis, BDSI stockholders are entitled to further disclosures on how those unlevered free cash flows were derived.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants for Violations of Section 14(e) of the Exchange Act**

102.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

103.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

104.    Defendants disseminated the Recommendation Statement to BDSI stockholders recommending that BDSI stockholders tender their shares to Collegium in connection with the Tender Offer.

105.    By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Recommendation Statement, Defendants were aware of their duty not to make false and misleading statements in the Recommendation Statement,

and not to omit material facts from the Recommendation Statement necessary to make statements made therein— in light of the circumstances under which they were made—not misleading.

106.    Yet, as specified in paragraphs 73-101 above, in violation of Section 14(e) of the Exchange Act, Defendants knowingly or recklessly (i) made untrue statements of material fact in the Recommendation Statement, and (ii) omitted material facts from the Recommendation Statement necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce BDSI stockholders to tender their shares in the Tender Offer, and thereby maximize their own personal gain from the immediate sale of all of their BDSI shares for cash, and the immediate conversion of all of their BDSI options and RSU's into cash. As such, the material misrepresentations and omissions in the Recommendation Statement specified above were made by Defendants with scienter.

107.    The material misrepresentations and omissions in the Recommendation Statement specified above are material insofar as there is a substantial likelihood that a reasonable BDSI stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable BDSI investor would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to BDSI stockholders.

108.    Because of the material misrepresentations and omissions in the Recommendation Statement specified above, Plaintiff and other BDSI stockholders are threatened with irreparable harm insofar as Plaintiff and other BDSI stockholders will be deprived of their entitlement to make a fully informed decision as to whether to tender their shares in connection with the Tender Offer if such material misrepresentations and omissions are not corrected prior to the Expiration Date. Therefore, injunctive relief is appropriate.

## COUNT II

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

109.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

110.     The Individual Defendants acted as controlling persons of BDSI within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of BDSI, and participation in, and/or awareness of BDSI's operations, and/or intimate knowledge of the contents of the Recommendation Statement filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of BDSI with respect to the Recommendation Statement, including the content and dissemination of the various statements in the Recommendation Statement that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

111.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

112.     Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of BDSI, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Recommendation Statement at issue references the unanimous recommendation of the Board to approve the Proposed Transactions, including the Tender Offer and the Merger, and recommend that BDSI stockholders tender their shares pursuant to the Tender Offer. The Individual Defendants were thus directly involved in the making of the

Recommendation Statement.

113.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transactions, including the Tender Offer and the Merger.   The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval. The Individual Defendants thus directly participated in the drafting of the Recommendation Statement.

114.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

115.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

116.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict, and can Plaintiff and other BDSI stockholders make an informed decision about whether to tender their shares pursuant to the Tender Offer.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily and permanently enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transactions, including the Tender Offer and the Merger, unless and until

Defendants disseminate a revised recommendation statement that does not contain false and misleading statements, and discloses all material facts necessary to make the statements contained therein not misleading;

B.    Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or awarding Plaintiff rescissory damages;

C.    Declaring that Defendants violated Sections 14(e) and 20(a) of the Exchange Act;

D.    Directing Defendant to account to Plaintiff for all damages suffered as a result of such violations;

E.    Awarding Plaintiff the costs of this action, including reasonable attorneys' fees and expert fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: February 28, 2022                    **WOHL & FRUCHTER LLP**

By: /s/ *Joshua E. Fruchter*
Joshua E. Fruchter (JF2970)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*